
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. LEE DEWANE WATTS**

**Appeal from the Criminal Court for Montgomery County**
**No. 41300705        Ross H. Hicks, Judge**

_____

**No. M2015-02404-CCA-R3-CD**

_____

A Montgomery County jury convicted the Defendant, Lee Dewane Watts, of two counts of first degree felony murder and one count of especially aggravated robbery.  The trial court merged the Defendant's first degree murder convictions and ordered him to serve a life sentence for first degree murder and a consecutive twenty-five year sentence for especially aggravated robbery.  On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly sentenced him by ordering consecutive sentences and ordering the maximum sentence for the especially aggravated robbery conviction; and (3) the trial court erred when it ruled that the Defendant's prior convictions would be admissible should he testify.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J. and ALAN E. GLENN, J, joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Lee Dewane Watts.

Herbert H. Slatery, III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber and Robert J. Nash, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**
**A. Trial**

This case arises from the beating and robbery of the victim, the Defendant's mother,

inside her home. The victim later died as a result of her injuries. A Montgomery County grand jury indicted the Defendant for two counts of felony first degree murder and one count of especially aggravated robbery. At a trial on the charges, the parties presented the following evidence: Officer Sean Walden testified that he was employed by the Clarksville Police Department and responded to a call at 9:00 a.m. on April 7, 2013. When he arrived at the scene, the victim's apartment, he found another officer, Sergeant John Crabbe, talking to the Defendant on the front porch and emergency personnel treating the victim inside. The Defendant identified himself as the victim's son. The Defendant indicated that the victim had recently received a monetary settlement, so police officers looked around the residence for money or evidence of a robbery. The Defendant stated that he had left the victim's apartment at midnight the previous night and had returned around 9:00 a.m. and found the victim "having trouble breathing."

On cross-examination, Officer Walden testified that the Defendant told him that he had called his girlfriend before he called the police. The Defendant's girlfriend later arrived at the scene. Officer Walden recalled that there did not appear to have been a struggle at the victim's apartment; however he observed blood spatters on the victim's headboard and the ceiling of her bedroom. When Officer Walden arrived at the scene, the Defendant was wearing a purple shirt, which he took off at some point and placed on a chair.

Sergeant John Crabbe with the Clarksville Police Department testified that he was the first to respond to the victim's apartment, where he found the victim in her bedroom and checked her injuries. The Defendant told him that there was approximately $2,000 in cash in the victim's apartment that she had received from a settlement of benefits, which created a "line of discussion" that a robbery might have occurred. Sergeant Crabbe did not find any money in the apartment. He did, however, notice a hammer on the living room floor. Sergeant Crabbe described the victim when he found her: "moaning, bleeding – a lot of blood around on the bed, around the head area of the bed."

A certified letter from the Nashville VA Regional Officer was admitted as an exhibit and read aloud in open court. The letter verified that the victim had received compensation benefits in the amount of $6,876 and $696 in 2013.

Jerri Willhyt testified that she lived in an apartment next door to the victim and had been introduced to the Defendant, the victim's son. Ms. Willhyt stated that she was at the victim's apartment almost every day, watching television, having dinner, talking, and playing computer games. To her knowledge, the Defendant spent three or four nights a week at the victim's apartment, but Ms. Willhyt "assumed" that he lived with his girlfriend. Ms. Willhyt recalled an evening when she had dinner with the victim and the Defendant, and the Defendant raised the topic of the victim's life insurance. The Defendant asked the

2

victim whom she had named as the beneficiary of her life insurance policy, and the victim replied that the beneficiary was her sister. The Defendant asked the victim to name him as the beneficiary, and the victim refused. This conversation occurred approximately one week before the police were called to the victim's apartment on April 7. Ms. Willhyt recalled a conversation where the Defendant asked the victim for money, thirty or forty dollars, and the victim told the Defendant she did not have it. The victim showed the Defendant the money in her wallet because he did not believe her. Ms. Willhyt recalled that the victim told her that the Defendant had been asking about "Pop's VA," in reference to the VA benefits the victim had received. Ms. Willhyt testified that on April 7, before the ambulance took the victim to the hospital, the Defendant asked Ms. Willhyt for money, which she refused to give him because he already owed her money.

Ms. Willhyt testified that on April 6, the night before the victim was found injured, Ms. Willhyt planned to go to the victim's apartment at 5:30 p.m., but the victim was taking the Defendant to work. At 8:30 p.m., Ms. Willhyt saw the victim's porch light come on, so she invited the victim over for dinner. The victim declined and said she was going to bed. Ms. Willhyt did not see the victim again that evening. Ms. Willhyt stated that it was not uncommon for the Defendant to arrive at the victim's apartment at around 1:00 or 2:00 a.m. At around midnight that night, Ms. Willhyt saw the victim's porch light come on, so she looked out her window and saw the victim's front door being shut from the inside. Ms. Willhyt did not observe anything else, and she went to bed at 2:00 a.m.

Bobby Lee Majors testified that he lived twenty or thirty feet from the victim's apartment and that he was grilling with some friends outside his house on April 6, 2013. His party ended at about 9:00 p.m., and he went to bed before 10:00 p.m. The next morning, Mr. Majors took his dog outside and was cleaning up his yard when he saw the Defendant coming out of the victim's apartment between 8:00 and 8:30 a.m. A short time later the police and paramedics arrived at the victim's apartment. Mr. Majors saw the Defendant walking down the street before the police arrived. Mr. Majors recalled that he had seen the Defendant the night before around dusk, wearing the same clothes he was wearing the next morning. Mr. Majors recalled that the Defendant was wearing a purple shirt.

Satara Ealum testified that on the night of April 6, 2013, and into the morning of April 7, she, the Defendant, and two other men were "smoking crack" in the Summit Heights projects, a fifteen-minute walk from the victim's apartment. Ms. Ealum was introduced to the Defendant by the two other men that evening, and she recalled that the Defendant paid for the crack they smoked, which was "served" to them by young boys. Several times throughout the night the group needed more crack, so the Defendant would leave and return with more money; he claimed to be going back and forth to his mother's house. After each trip to his mother's house, the Defendant returned with money. At

around 4:00 a.m., the Defendant and Ms. Ealum checked into a hotel room, and he left the next morning at around 8:00 a.m. She estimated that they smoked crack at Summit Heights from midnight until 4:00 a.m. Ms. Ealum reiterated that the Defendant paid for the crack that they smoked and that he also paid for the hotel room. She estimated that the Defendant provided several hundred dollars that night. Ms. Ealum testified that when the Defendant left the hotel room he said he was going to his mother's to get more money, but he never returned.

On cross-examination, Ms. Ealum testified that she was a convicted felon and had a crack cocaine addiction. Ms. Ealum recalled that on April 6, 2013, she was walking with a friend in Summit Heights projects when they met the Defendant and the two other men, "Jay" and "JB," who were getting high off crack cocaine. The group went inside an apartment to continue smoking together. She testified that a crack cocaine high lasts fifteen to twenty minutes. The Defendant left the apartment, telling the group he was going to his mother's house to get more money to buy more crack cocaine. At some point while they were inside the apartment that night, the Defendant told Ms. Ealum that he had done something wrong.

Jessie Buckley, or "JB," testified that he met the Defendant on the night of April 6, 2013, when he and a group went to Summit Heights and smoked crack cocaine inside an apartment. The Defendant paid Mr. Buckley for the crack cocaine, initially paying one hundred dollars for a purchase and then two hundred dollars for a second purchase. He did not recall the Defendant leaving the apartment at any time.

On cross-examination, Mr. Buckley agreed that the Defendant had in fact left the apartment at some point and returned with more money to buy more crack cocaine from Mr. Buckley. Mr. Buckley described himself as the middle man for the buy.

John Fisher, or "Jay," testified that he knew Mr. Buckley who introduced him to the Defendant at Summit Heights. He guessed that the group that evening, which included himself, the Defendant, Mr. Buckley, and Ms. Ealum, gathered together around 1:30 a.m. and began smoking crack cocaine. When the group ran out of cocaine, the Defendant left to get more money and came back with several hundred dollar bills. The following morning, the Defendant sent a text message to Mr. Fisher saying that the Defendant's mother had been beaten up. The Defendant reiterated in his messages that he had been with Mr. Fisher the night before, and Mr. Fisher sent a message to the Defendant denying that they had been together all night. Mr. Fisher testified that he thought the text messages were sent so the Defendant could establish an alibi.

Krystal Lauderdale testified that she lived on the same street as the victim and knew the Defendant from when he had done some household jobs for her while her husband was

away for military duties. Several times, the Defendant spoke about the victim to Ms. Lauderdale, and she could "tell that there wasn't a love feeling. I sensed that it was [] hatred." Ms. Lauderdale recalled that the Defendant would get angry when the victim would call him and that on several occasions he said that the victim "would be better off dead just because [the Defendant] was sick of dealing with her and taking care of her so to speak." The Defendant also mentioned that the victim had "money stashed" and that the Defendant would give her all the money he made, and she would hide it under her mattress. The Defendant said that the victim "drained him dry of all the money he made."

Officer Joshua Jobe testified that he processed the crime scene for evidence and that he recovered a purple shirt found on the front porch of the victim's apartment and a hammer found on the floor of the living room.

Detective Richard Duke testified he interviewed the Defendant on April 7, 2013 at Clarksville Police Department headquarters. The interview was video recorded, and the recording was played for the jury. Detective Duke testified that he visited the Defendant's place of employment with him, Frosty Morn warehouse, and the Defendant identified a place in the warehouse where he slept. In the interview, the Defendant told the detective that on April 6, 2013, he had been to the victim's house sometime around 6:00 p.m. and that he left to go to the warehouse at some point, though he was unclear on what time and how long he stayed at the warehouse. The Defendant stated that he returned to the victim's house at some point that evening and then left again around midnight and returned to the warehouse. He told the detective that he locked the victim's door when he departed at midnight. The Defendant worked at the warehouse until approximately 4 a.m. The Defendant denied that he hurt the victim and stated that it must have been someone else who injured her. The Defendant also stated that only he and the victim had keys to her apartment.

Dr. Adele Lewis testified that she was employed at the Davidson County Medical Examiner's office and that she performed the autopsy on the victim on April 10, 2013. She stated that the cause of the victim's death was at least two blunt force injuries to the head. Her opinion was that the manner of death was homicide. She stated that the victim had other "superficial" injuries, which she listed as: large bruise on the victim's chest, two bruises on her upper right arm, multiple red or purple bruises on her right wrist, swelling and bruising on both of her forearms. In Dr. Lewis's opinion, the victim's wounds appeared to be defensive. The victim's brain was swollen, and she had suffered bleeding on the brain and in the brain. Her injuries were caused by being struck in the head by an object. The victim's skull was also fractured. Dr. Lewis testified that the use of a hammer would be consistent with the victim's injuries.

Dr. Oscar Guillamondegui testified that he worked as a trauma surgeon and was the

medical director for trauma services at Vanderbilt University Medical Center. Dr. Guillamondegui was qualified as an expert in trauma surgery and critical care. He testified that he treated the victim for a brain injury and stated that she suffered from the highest classification of brain injuries, which appeared to be caused by blunt force injuries to her skull. He described her skull as being "crushed into multiple pieces." The victim presented at the hospital with some neurologic function: she was able to blink and move her fingers when asked to do so. Dr. Guillamondegui stated that the victim was in pain, and medical personnel treated her pain with medicine. Dr. Guillamondegui then performed a "decompressive craniotomy" on the victim to allow her brain to expand by removing a piece of her skull. The victim's progress after the craniotomy was "poor," and doctors were not able to control the swelling on her brain, causing her brain to push down on the victim's spinal cord. Following this, as it was likely that the brain's swelling would lead to the victim's death, the victim received "compassionate care" to make her as comfortable as possible, including pain control and sedation. On April 9, 2013, the victim's ventilation system, which was breathing for her, was removed. In Dr. Guillamondegui's opinion the cause of the victim's death was severe traumatic brain injury consistent with an injury caused by a hammer.

Dr. Laura Boos testified that she worked at the Tennessee Bureau of Investigation ("TBI") and the trial court qualified her as an expert in the fields of DNA and serology. Dr. Boos performed an analysis on the Defendant's purple shirt found on the porch of the victim's home. Several blood spots on the shirt matched the Defendant's DNA. Dr. Boos also analyzed the hammer and found a blood spot with a partial match to the victim.

Detective Eric Ewing testified that he was the lead detective on this case and that he interviewed the Defendant on April 12, 2013. A video recording of the interview was played for the jury. When asked to summarize the interview pertaining to the night before the victim's death, Detective Ewing stated that the Defendant said he was at the victim's apartment between 5:00 p.m. and 6:00 p.m. and remained there until the victim dropped him off at the warehouse at 8:00 p.m. The Defendant said he worked for a couple of hours and then walked back to the victim's apartment before returning to the warehouse at 11:45 p.m. Detective Ewing testified that the Defendant's story was inconsistent about what happened after midnight. In one version, the Defendant remained at the warehouse all night. In a second version, he remained at the warehouse until 3:30 a.m. and then he left to call his girlfriend on the phone. In a third version, after being confronted with the fact that the police knew he had gone to a hotel, the Defendant claimed to be at a hotel with a woman. The Defendant did not admit to drug use in the first two versions but admitted to using drugs at the hotel. Throughout the majority of the interview, the Defendant denied hurting his mother. At some point in the interview, the Defendant told Detective Ewing that the victim had given him money to buy drugs and that he returned to her apartment three or four times that night for money.

6

Later in the interview, the Defendant and Detective Ewing left the interview room to smoke a cigarette. Detective Ewing testified that, during the cigarette break, the Defendant admitted to Detective Ewing that he had hurt the victim and stated that he used a hammer to hit her, which he said would be found inside her apartment. Back in the interview room, Detective Ewing told the Defendant that he admired him for telling the truth. The Defendant stated that he had "no idea" why he hurt the victim. He stated that he hit the victim with a hammer "I don't know how many times." The Defendant wrote out a two-page statement which was admitted into evidence. In it, the Defendant asked God and his family to forgive him and stated that his mother had never loved him or met his needs as a child.

On cross-examination, Detective Ewing agreed that there were other suspects in the victim's death but that he did not pursue them extensively because the evidence led to the Defendant as the main suspect. He agreed, however, that he did not receive the DNA results until several months after the victim's death. He agreed that the results identified three separate DNA profiles found on the evidence but that he only submitted the Defendant's and the victim's DNA to be compared. Detective Ewing stated that he did not test Ms. Willhyt's DNA. He agreed that it seemed "odd" that the Defendant's girlfriend entered into a relationship with Mr. Buckley after the incident but stated that he never interviewed Mr. Buckley or asked him to give a DNA sample. Detective Ewing agreed that his interview with the Defendant took place in a small room and that he "crowd[ed]" the Defendant while he questioned him. He also agreed that he was bigger than the Defendant and dressed in black during their interview, that the interview lasted for five hours, and that the Defendant was not given any food during the interview. He denied trying to trick the Defendant into confessing to killing the victim.

On redirect-examination, Detective Ewing said that he took over the investigation on April 10, after the victim had died and when the case officially became classified as a homicide. On April 10, Detective Ewing was driving around searching for another suspect he had developed from an anonymous tip. While he was driving, the Defendant called Detective Ewing to ask if Detective Ewing had the victim's will. At this point, Detective Ewing also knew what Mr. Fisher, Mr. Buckley, Ms. Ealum, and Ms. Willhyt had told police about the night of the victim's death.

Based on this evidence, the jury convicted the Defendant of two counts of first degree felony murder and one count of especially aggravated robbery.

## B. Sentencing

At a subsequent sentencing hearing, the presentence report was admitted as an

exhibit. The Defendant made a statement denying that he had killed the victim. The State identified that the Defendant was on parole at the time he committed these offenses. In sentencing the Defendant, the trial court stated that it was considering the purposes of sentencing consistent with the Sentencing Reform Act and that the Defendant's sentence would be justly deserved in relation to the seriousness of his offense. The trial court stated that rehabilitation outside of incarceration had not worked previously for the Defendant. The trial court found that confinement was necessary to protect society from the Defendant and that several enhancement factors were applicable. The trial court found enhancement factor (1) applied, that the Defendant had a previous history of criminal convictions. *See* T.C.A. § 40-35-114(1). It further found that enhancement factor (4) applied, that the victim was particularly vulnerable, which the trial court stated applied because, over the course of several hours on the night of the victim's beating, the Defendant kept returning to the victim's apartment for more money and attacked her repeatedly, making her more vulnerable as the night went on. The trial court also applied enhancement factor (13)(D), that the Defendant was released on parole at the time of his offense. *Id.* (4) and (13). The trial court went on to say:

> This was a severe offense, and as we see this morning, the Defendant indicates no remorse but still denies his responsibility and culpability in this case. Certainly, the imposition of maximum sentencing and consecutive sentencing serves to protect the public from further criminal conduct. [The Defendant] has a very, very long history of criminal conduct. It is true that none of those offenses involve prior violence but [his] history is long nonetheless.

> I have already discussed the general principles of sentencing certainly the general principles of sentencing argue in favor of a harsh sentence in this case. So I think it goes without saying that in this case, obviously the risk to human life was high. [The Defendant's] actions cost us the life of his mother. The circumstances indicate that he is a dangerous offender. For all the reasons I have discussed, the Court sentences [the Defendant] to a life sentence with regard to the felony murder conviction. The sentence is to be consecutive with the parole sentence he is now serving. With regard to the conviction in count three of the indictment, for especially aggravated robbery, the Court finds [the Defendant] guilty obviously and sentences him to twenty-five years, the maximum sentence. That sentence is also to be consecutive to the life sentence that he is to serve for the felony murder conviction.

The trial court clarified that it would merge the two convictions for felony first degree murder. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly sentenced him by ordering that his sentences run consecutively and by ordering the maximum sentence for the especially aggravated robbery conviction; and (3) the trial court erred when it ruled that the Defendant's prior convictions would be admissible should he have chosen to testify.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because there is no evidence that proves beyond a reasonable doubt that he committed the crimes. He alleges that his confession must be corroborated as required by *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), and that there is insufficient evidence to do so. The State responds that there is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of his convictions and that there is "abundant proof" that strengthened or bolstered the Defendant's confession, including the hammer with the victim's blood and DNA on it, the Defendant's statement to neighbors about the victim and her finances, the victim's VA benefit payments, witness statements from the night of the murder, and the lack of forced entry into the victim's apartment. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As relevant here, first degree felony murder is, in relevant part, the "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery [.]" T.C.A. § 39-13-202(a)(2) (2014). "No culpable mental state is required for conviction . . . except the intent to commit the enumerated offenses or acts[.]" *Id.* § 39-13-202(b). Especially aggravated robbery is robbery as defined in § 39-13-401 "[a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a)(1)-(2) (2014). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "Serious bodily injury means bodily injury that involves . . . [a] substantial

risk of death; [or] [e]xtreme physical pain." T.C.A. § 39-11-106(a)(34) (2014).

Relevant to the victim's murder, the evidence, considered in the light most favorable to the State, shows that on the night the victim was beaten, the Defendant came and went from her apartment multiple times to obtain money to buy drugs. Several witnesses smoking crack cocaine with the Defendant that night testified that he left their group and said he was going to his mother's house for more money. The Defendant and the victim were the only two people with access to her apartment and there were no signs of forced entry. The Defendant admitted to being at the victim's apartment sometime that night and eyewitnesses including the victim's neighbor saw the Defendant leaving the victim's apartment a short time before the victim was found by police and paramedics with serious injuries. The victim suffered blunt force trauma to her head, which caused her to lose brain function and die soon after. A hammer was found on the floor of her apartment, and medical experts testified that her injuries were consistent with being inflicted by a hammer. The victim's blood was found on the hammer, and the Defendant's blood was found on a shirt he was seen wearing the night before and the morning after the victim was beaten. The victim had several wounds classified by the medical examiner as "defensive." When questioned by police, the Defendant admitted to hitting the victim with the hammer multiple times, and he gave a written statement asking God for forgiveness. This evidence is sufficient from which the jury could have found beyond a reasonable doubt that the Defendant went to the victim's apartment and beat her in the head with a hammer, causing her death.

Relevant to the robbery, witnesses testified that the Defendant left the group multiple times that night, saying he was going to the victim's apartment, and each time he returned with more money and purchased more drugs. In the past and in front of neighbors, the Defendant had discussed with the victim the fact that the victim had received a benefit check that the Defendant wanted the victim to share with him. A letter from the VA confirmed that the victim had received benefits of over $6,000. The Defendant also discussed with the victim her life insurance policy, and asked the victim for money several times in front of her neighbor. On the morning the victim was found and while she was being treated by paramedics, the Defendant asked the victim's neighbor for money as well. A hammer was found inside the victim's apartment with her blood on it, and she suffered life threatening injuries consistent with being beaten in the head by a hammer. This evidence is sufficient to support the jury's conclusion beyond a reasonable doubt that the Defendant was guilty of especially aggravated robbery.

The Defendant contends that his confession was not corroborated by physical evidence as required by *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014) (requiring that the State introduce "independent proof of facts and circumstances" to assure the credibility of extrajudicial confessions when a conviction rests primarily on the defendant's inculpatory

11

statements).  The State responds that a host of evidence was presented to corroborate the Defendant's confession, and we agree with the State.  The Defendant's confession was corroborated by witnesses who said that the Defendant went to his mother's house for money and that he repeatedly returned to the group with additional funds with which he purchased cocaine.  Additionally, other witnesses testified about the Defendant's expressed hostility and even "a hatred" toward his mother as well as his interest in her monetary affairs.  The Defendant's statement to police included the specific method by which he carried out the homicide which was with a hammer.  This fact was corroborated by police testimony that a bloody hammer was recovered from the living room at the scene.

We conclude that the proof is sufficient to support the Defendant's convictions beyond a reasonable doubt.  The Defendant is not entitled to relief.

## B. Sentencing

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles.  T.C.A. § 40-35-210(c)(2), (d) (2014); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"  380 S.W.3d 682, 708 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).  To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision.  *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).  The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise,* 380 S.W.3d at 709-10.  In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness.  *Id.* at 707.

### i. Consecutive Sentencing

The Defendant contends that the trial court erred when it ordered his sentences to be

served consecutively and that the trial court erred when it classified him as a dangerous offender, considering that his criminal history was not violent. The State responds that the trial court did not abuse its discretion when it ordered his sentence for especially aggravated robbery to be served consecutively to his life sentence, arguing that the trial court found that the Defendant had a long history of criminal conduct and that he was a dangerous offender whose behavior indicated little or no regard for human life. The State contends that the record supports these conclusions. We agree with the State.

We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2), (4). Additionally, Tennessee Code Annotated section 40-28-123 provides that a defendant who is convicted of a felony while on parole shall serve "the remainder of the sentence under which the [defendant] was paroled, or such part of that sentence, as the board may determine before the [defendant] commences serving the sentence received for the felony committed while on parole. . . ." § 40-28-123(a) (2014). This language has been interpreted to "require, as a matter of law, that the sentence for an offense committed while on parole be served consecutively to the prior sentence." *Kent Ousley v. David Mills, Warden*, No. W2004-02078-CCA-R3-HC, 2005 WL 1457792, at \*3 (Tenn. Crim. App., at Jackson, June 17, 2005) (citing *State v. Venable*, 606 S.W.2d 298 (Tenn. Crim. App. 1980), *no perm. app. filed*. Furthermore, Tennessee Rule of Criminal Procedure 32(c)(3) states that consecutive sentencing is mandatory when the defendant has committed a felony while on parole for a felony. T.R.C.P. 32(c)(3)(A).

The trial court ordered the Defendant to serve his life sentence in this case consecutively to his parole sentence, which the trial court was required to do as a matter of law. *See* Tenn. R. Crim. P. 32(c)(3)(A) and T.C.A. § 40-28-123(a). The trial court also ordered the Defendant's sentence for especially aggravated robbery to be served consecutively to his life sentence. In doing so, the trial court found that the Defendant was a dangerous offender. Our review of the record reflects that, while the trial court did not specifically address the *Wilkerson* factors in applying the dangerous offender criteria, the record supports that the sentence imposed is necessary to protect the public and reasonably relates to the severity of the offense. Accordingly, we conclude that the sentence is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles of the sentencing statute. The Defendant is not entitled to relief as to this issue.

## ii. Especially Aggravated Robbery

The Defendant further contends that the trial court erred when it ordered the maximum sentence for his especially aggravated robbery conviction, and he contends that the trial court misapplied one of the three enhancement factors in so doing. The State responds that the trial court properly applied the enhancement factors in ordering the Defendant's sentence.

We note that the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2014); *see also Bise*, 380 S.W .3d at 699 n. 33, 704; *Carter*, 254 S.W.3d at 343. "[A] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W .3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

At the sentencing hearing, the trial court properly consider the factors set out in Tennessee Code Annotated § 40-35-210(b). In considering enhancement and mitigating factors, the trial court found applicable enhancement factor (1), that the Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). Next, the trial court found applicable that the victim "was particularly vulnerable because of age or physical or mental disability[.]" *Id.* § 40-35-114(4). Finally, the trial court found that the Defendant was on parole at the time of the offenses. *Id.* § 40-35-114(13)(B).

The Defendant argues that the trial court misapplied enhancement factor (4) because there was no proof that the victim suffered from mental or physical disabilities to make her vulnerable to his attacks. He contends that the trial court's conclusion that the victim "became vulnerable as a result of the attacks" is misplaced. We agree with the Defendant that there was little proof to support that the victim was vulnerable before the Defendant's attacks, necessary to support the trial court's application of enhancement factor (4). However, our supreme court has previously stated,

> a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly

14

departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706.

In the instant case, the trial court applied three enhancement factors, enhancement factors (1), (4), and (13), and the Defendant concedes that the trial court properly applied two of them, factors (1) and (13). The evidence supports the trial court's application of enhancement factors (1) and (13), and thus, the within-range sentence imposed should be upheld. *See Bise*, 380 S.W.3d at 706 (concluding that if there are "other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld"). The Defendant is not entitled to relief on this issue.

### C. Admissibility of the Defendant's Prior Convictions

The Defendant lastly contends that the trial court erred when it ruled that the Defendant's prior convictions, thirteen convictions in all including those for aggravated burglary, burglary, and burglary of a motor vehicle, would be admissible as evidence if the Defendant chose to testify. He contends that these prior convictions "would be propensity type evidence" specifically excluded by Tennessee Rule of Evidence 404(b) and that their prejudice would have substantially outweighed their probative value. The State responds that the Defendant has waived this issue on appeal because he has failed to include in the record a transcript of the hearing on this evidentiary issue or a record of the trial court's ruling. We agree with the State.

Defendants have a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal" and will enable the appellate court to decide the issues. T.R.A.P. 24(b).

It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue. Moreover, the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial. In summary, a defendant is effectively denied appellate review of an issue when the record transmitted to the appellate court does not contain a transcription of the relevant proceedings in the trial court.

*State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). A defendant's failure to include a complete transcript of the proceedings forming the basis of this appeal results in waiver to any challenge of the lower court's rulings. *See generally State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (appellant's failure to provide court with complete record relevant to issues presented constitutes waiver of issue); *Draper*, 800 S.W.2d at 493 (appellate court is precluded from considering issue when record does not contain transcript of what transpired in trial court with respect to that issue).

The record contains a motion filed by the Defendant on June 26, 2015, to determine the admissibility of the Defendant's prior convictions for impeachment purposes should the Defendant elect to testify. In his brief, the Defendant states that the trial court ruled on August 11, 2015, that the Defendant's prior convictions would be admissible. This order, however, is not contained in the technical record and no transcript of the pre-trial hearing is included in the record. Alternatively, the Defendant did not file a summary of the facts pursuant to Tennessee Rule of Appellate Procedure 24. Thus, we are left with the record as provided by the Defendant. In the absence of a complete record, we must presume the findings of the trial court are correct. *See State v. Boling*, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992). As such, we presume the correctness of the trial court's determination that the Defendant's prior convictions were admissible for impeachment purposes. The Defendant is not entitled to relief.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

16